**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

GUENEVIERE WOLVEN <u>a/k/a</u> <u>Gueneviere</u>
<u>Gardner</u>,

                                              Plaintiff,

          v.                                                              No. 12-CV-1308
                                                                              (FJS/CFH)

CAROLYN W. COLVIN, Commissioner of
Social Security,

                                              Defendant.

_____

**APPEARANCES:**                                **OF COUNSEL:**

BINDER & BINDER                           CHARLES E. BINDER, ESQ.
Attorney for Plaintiff
60 East 42nd Street
Suite 520
New York, New York 10165

HON. RICHARD S. HARTUNIAN            JOANNE JACKSON, ESQ.
United States Attorney for the            Special Assistant United States Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

          Plaintiff Gueneviere Wolven ("Wolven") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

Wolven moves for a finding of disability and the Commissioner cross-moves for a

_____

          [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings.  Dkt. Nos. 9, 10, 13.  For the reasons which follow, it is

recommended that the Commissioner's decision be affirmed.


# I. Background

## A. Facts

Born on October 25, 1981, Wolven was twenty-eight years old when she applied

for disability benefits.  T. 136.[2]  Wolven received a General Educational Development

("GED") diploma as well as an Associate's Degree, and was working towards her

Bachelor's degree.  T. 55, 142, 305. Wolven's previous work experience includes

customer service, working as a cashier, and being a sales representative.  T. 143.

Wolven alleges disability from multiple impairments including migraines, post traumatic

stress disorder, major depression, and generalized anxiety.  T. 50, 141.


## B. Procedural History

On or about February 16, 2010, Wolven filed an application for disability

insurance benefits and social security income ("SSI") pursuant to the Social Security

Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of February 9, 2010.  T.

118-122, 136, 142.  That application was denied on May 12, 2010.  T. 75-81.  Wolven

requested a hearing before an administrative law judge ("ALJ"), which was held before

Apolo Garcia on March 11, 2011.  T. 83-91, 47-70 (transcript of the hearing).  In a

decision dated March 18, 2011, the ALJ held that Wolven was not entitled to disability

_____

[2]"T." followed by a number refers to the pages of the administrative transcript
filed by the Commissioner.  Docket No. 10.

benefits. T. 30-42. Wolven's counsel filed a timely request for review with the Appeals Council and on June 22, 2012 the request was denied, thus making the ALJ's findings the final decision of the Commissioner. T. 1-28. This action followed.

## II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Berry, 675 F.2d at 467. Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."' Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## B.  Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability. . .
benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment . . . which has lasted or can be expected to last for a
continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically
determinable impairment is an affliction that is so severe that it renders an individual
unable to continue with his or her previous work or any other employment that may be
available to him or her based upon age, education, and work experience.  Id. §
423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical
and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the
impairment is "based [upon] objective medical facts, diagnoses or medical opinions
inferable from [the] facts, subjective complaints of pain or disability, and educational
background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018(NRB),
2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d
1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §
404.1520, to determine whether an individual is entitled to disability benefits:

First, the [Commissioner] considers whether the claimant is currently

---

[3] While the SSI program has special economic eligibility requirements, the
requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI)
and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are
identical, so that "decisions under these sections are cited interchangeably."  Donato v.
Sec 'y of Health and Human Servs., 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation
omitted).

engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

### C. ALJ Garcia's Findings

Wolven, represented by a non-attorney representative, testified at the hearing held on March 11, 2011, in addition to an impartial vocational expert. T. 33, 47-70 (transcript from the administrative hearing). Using the five-step disability sequential evaluation, the ALJ found that Wolven (1) had not engaged in substantial gainful activity since February 9, 2010, the alleged onset date; (2) had the following severe medically determinable impairments: migraine headaches, depression, and anxiety disorder; (3)

5

did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [("RFC")] to perform a full range of work at all exertional levels but with . . . nonexertional limitations: the claimant can perform simple, repetitive tasks [and] . . . cannot tolerate concentrated exposure to sunlight," and thus, (5) could perform her past relevant work as a cashier. Therefore, a determination of not disabled was made.

### D. Wolven's Contentions

Wolven first contends that the ALJ failed to properly apply the treating physician rule when evaluating the medical evidence. Wolven next contends that the ALJ's misconduct in questioning her about her sexuality and relationship warrant remand.

### 1. Treating Physician's Rule

Wolven contends that the ALJ erred when he (1) dismissed the opinions of Drs. Denno, Wolven's treating physician, and Davis, Wolven's treating psychologist; (2) failed to contact Dr. Denno for additional treatment records; and (3) relied in any part of the mental assessment of non-examining state-agency consultant Dr. Ferrin. When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991). Generally, more weight is given to a treating source. Under the

regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134. "This rule applies equally to retrospective opinions given by treating physicians." Campbell v. Astrue, 596 F. Supp. 2d 445, 452 (D. Conn. 2009) (citations omitted). Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal, 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

Wolven first contends that Dr. Denno's assessment should have been given controlling weight. Dr. Denno authored a letter on June 16, 2010 that stated that Wolven "ha[d] severe chronic migraine headaches and an anxiety disorder. . . Because of frequent headaches she has missed many days of work [and d]uring these headaches she is totally disabled . . . [Moreover c]omplicating these headaches is severe anxiety and PTSD which is active . . . ." T. 283. Dr. Denno had been treating

7

Wolven since 2008.  T. 229.  Dr. Denno saw Wolven on approximately ten occasions between February 2008 and April 2010.  T. 221-29, 308-09.  Seven of those occasions dealt with symptoms other than migraines, generally the flu or allergic reactions.  T. 221-24, 227-29.

On January 5, 2009, Wolven was seen by Dr. Denno after going to the emergency room the night before for a migraine.  T. 225.  Wolven was referred to a neurologist.  Id.  Wolven next returned to Dr. Denno regarding her migraines on March 29, 2010.  T. 308.  Wolven was without insurance and medication and was seeking advice on treatments which would prevent the onset of her migraines.  Id.  She sought, and was provided with, samples of various medication.  Id.  Wolven again returned a month later.  T. 309.  Dr. Denno noted that Wolven was "[w]ell and in no apparent distress," and did not require any additional medication refills at that time.  Id.  Wolven was again recommended to have a neurology consultation and therapy for her psychological issues.  Id.

Wolven contends that Dr. Denno's opinions are uncontradicted.  To the extent that this argument references Dr. Denno's diagnoses of both migraines and anxiety disorders, this is true.  This is also recognized by the ALJ, who found both of these impairments to be severe in his analysis.  T. 35.  There is no question that the neurologist consultation and MRI indicated the presence of migraine headaches.  T. 216-19.  Rather, the ALJ simply disagreed with Dr. Denno's ultimate opinion regarding Wolven's ability to work.  This is within the ALJ's province.  SSR 96-5P, 1996 WL 374183, at *1 (S.S.A. 1996) (explaining that determinations of disability are reserved for the Commissioner and to the extent a treating source comments on that issue, such

8

commentary is "never entitled to controlling weight or special significance."); <u>see</u> <u>also</u>

<u>Taylor v. Barnhart</u>, 83 Fed. App'x 347, 349 (2d Cir. 2003) (explaining that a treating

physician's opinion about disability "is not entitled to any weight, since the ultimate

issue of disability is reserved for the Commissioner.") (citing 20 C.F.R. § 404.1527(d)(1)

& <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999)).

Rather, to be entitled to controlling weight, the treating physician's opinion must

be well supported by medically acceptable evidence and not inconsistent with other

substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); <u>Shaw</u>, 221 F.3d

at 134. The ALJ found Dr. Denno's opinions unpersuasive because "the medical

evidence does not demonstrate an increase in headache-related or mental health

symptoms between 2009 and 2010 (and, in fact, suggests a decrease in symptoms

given sparse treatment and stable clinical signs since the alleged onset of disability)

and [Wolven's] wages significantly exceeded substantial gainful activity levels in 2009 .

. . ." T. 41; <u>see also</u> T. 39 ("Despite an increase in her migraine symptoms and these

MRI findings, the claimant worked at substantial gainful activity levels through 2009,

earning $20,677.74, and earned $2,581.00 in the first quarter of 2010.").

During the neurology consultation with Dr. Pickard, he noted that Wolven was

"cooperative . . . in no acute distress," and that her "[r]ecent and remote memory are

intact[, and a]ttention span and concentration . . . [and f]und-of-knowledge [were]

normal." T. 219. Dr. Pickard recommended changes to her migraine medication and

planned to see her in a month. <u>Id.</u> Wolven next received treatment for migraines by

visiting the emergency room on July 3, 2009 and August 13, 2009. T. 254-64. Wolven

next received medical treatment through the emergency room three months later on

November 2, 2009 for a migraine.  T.265-70.  Wolven was seen in the emergency room for a "nonspecific headache" on February 9, 2010.  T. 273-75.  Wolven then saw Dr. Denno on March 29, 2010 expressing concern about preventing her migraines, as discussed above.  T. 308.  Wolven returned to the emergency room for another "mild" migraine on May 31, 2010, appearing alert and without distress.  T. 277, 280-82.  There are no further treatment records related to her migraines included in the record.

On April 26, 2010, Wolven underwent a psychiatric evaluation with consultative examiner Dr. Dubro.  T. 230-34.  Dr. Dubro is a licensed psychologist.  T. 234.  He noted that Wolven drove herself thirty miles to the appointment, received her GED and an Associate's degree and had worked full-time up until the winter of 2010 and for the previous two and half years as a cashier.  T. 230.  Wolven was never psychiatrically hospitalized and had received outpatient treatment for three years from 2004-2007.  Id. While Wolven stated that she had been "irritable and anxious" and was "experiencing difficulty in dealing with day-to-day stress," Dr. Dubro noted that her thought process was "[c]oherent and goal directed;" affect was appropriate; attention and concentration was somewhat impaired due to anxiety but that she could perform simple mental math; recent and remote memory was also somewhat impaired due to nervousness but that she recalled three out of three items after both one and five minutes and repeated five digits forward and three digits backward; and cognitive functioning was in the low average range.  T. 230-32.

Dr. Dubro noted that Wolven wore sunglasses, claiming "that fluorescent lights can bring on headaches;" however, Dr. Dubro saw "no evidence of fidgety or hyperactive behavior," during the exam.  T. 231.  Wolven also noted that she could

dress and attend to her personal hygiene independently on a daily basis. T. 232.

Wolven reported "difficulties focusing for long periods of time" and says that while

suffering from a migraine "she fatigues easily and is only doing light cleaning at home."

Id.

Dr. Dubro concluded that Wolven could follow and understand simple directions

and instructions and attend to and remember simple instructions and directions. T.

232. Dr. Dubro found that Wolven had (1) mild impairments in her attention span and

concentration; (2) mild difficulties learning new tasks; (3) mild to moderate difficulties

performing complex tasks independently; (4) mild to moderate difficulties interacting

with others; and (5) mild to moderate difficulties in her ability to regularly attend to a

routine and maintain a schedule. Id. at 232-33. Overall, her prognosis was fair. Id. at

233.

Dr. Dubro is both a specialist and examining consultative examiner. The opinion

of a consultative examiner like Dr. Dubro may constitute substantial evidence.

> It is well settled that an ALJ is entitled to rely upon the
> opinions of both examining and non-examining State agency
> medical consults, since such consultants are deemed to be
> qualified experts in the field of social security disability.
> Such reliance is particularly appropriate where . . . the
> opinions of these . . . State agency medical consultants are
> supported by the weight of the evidence.

See Fiozzo v. Barnhart, No. 05-CV-561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y.

Jan. 19, 2011) (citations omitted); see also Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d

Cir. 1995) (explaining that "the opinions of nonexamining sources [can] override treating

sources' opinions provided they are supported by evidence in the record.") (citations

omitted); McEaney v. Comm. of Soc. Sec., 536 F. Supp. 2d 252, 256 (N.D.N.Y. 2008)

("the evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence . . . An ALJ must treat such evaluations as expert opinion evidence of non-examining sources . . . This treatment extends to . . . RFC assessments [because] . . . [s]tate agency consultants are experts in evaluating the medical issues of disability claims.") (citations omitted).  The record does show that Wolven received treatment for her migraines on occasion from the emergency department, but it also shows that her treatment history was brief and sporadic and that she was able to engage in school[4] and independently attend to her activities of daily living without issue.  Such is consistent with the mild findings that Dr. Dubro made.  The ALJ "is entitled to rely not only on what the record says, but also on what it does not say."  Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (citations omitted).  The record fails to support such sweeping and broad restrictions as Dr. Denno has proffered.

Moreover, the record shows that Wolven was not only working, but gainfully employed, in 2009 when her migraine symptoms increased necessitating four trips to the emergency department, a MRI and a neurology consultation.  An ability to continue gainful employment while allegedly disabling symptoms are apparent and increasing, without a subsequent worsening, renders later claims of disability disingenuous.  Snell, 177 F.3d 128, 136 (explaining that "if [claimant's] mental condition never deteriorated from what it was while she was working, she cannot claim to have become disabled by reason of mental impairment.")

---

[4] Wolven has an Associates degree and testified that she was currently enrolled in online courses in her pursuit to become a psychologist.  T. 55, 142.

Wolven contends that the ALJ was mistaken in failing to request two missing treatment records from Dr. Denno, contending that consideration of such would have led to substantial evidence of Wolven's disabling migraine condition. An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citations omitted); see also 20 C.F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application . . . ."); 20 C.F.R. § 404.1512(e)(explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations). Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citations omitted); see also Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citations omitted); Roat v. Barnhart, 717 F. Supp. 2d 241, 264 (N.D.N.Y. 2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks and citations omitted).

This duty exists, in varying degrees, depending upon whether or not the claimant is represented and in what capacity.  See Smith v. Bowen, 687 F. Supp. 902, 906 (S.D.N.Y. 1988) ("The ALJ's duty to develop the comprehensive record . . . is greatest when claimant is unrepresented; but the duty still exists when plaintiff is represented and even more . . . where plaintiff if represented . . . by a paralegal."); see also Cruz v. Sullivan, 912 F.2d 8, 11, (2d Cir. 1990) ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all of the relevant facts.") (internal quotation marks and citations omitted).  Specifically, when discussed in the context of a treating physician, the inquiry has revolved around the quality of the records which have been provided to the ALJ for review.  See Moore v. Astrue, No. 11-CV-952 (TJM/CFH), 2013 WL 935855, at *4-*5 (N.D.N.Y. Feb. 5, 2013).

> [I]t is not sufficient for the ALJ simply to secure raw data from the treating physician.  What is valuable about the perspective of the treating physician . . . is his opportunity to develop an informed opinion as to the physical status of a patient.  To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician.

Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991).

While it is true that two notations from treatment dates were missing, it is arguable that they resulted in an appreciable gap in the medical record.  Wolven's medical history was well established, as was the sporadic nature of her treatment and her ability to continue working while she was allegedly suffering from increasingly

disabling symptoms.  However, assuming that the ALJ should have made an effort to

recontact Dr. Denno, the failure to do so is, at best, harmless error.  First, the records

were submitted to and considered by the Appeals Council and they determined that the

two treatment notations were insufficient to render the ALJ's findings incorrect.  T. 1-6

(outlining in pages 5 & 6 that Dr. Denno's treatment notes from March and April 2010

were incorporated into the record upon review before the Appeals Council).  Second, in

reviewing the records, they show Wolven's concern about migraine prevention, but they

do not otherwise indicate a gross declination in her physical health status.  Even

considering those additional records, they do not disrupt the fact that the ALJ's decision

to deny disability was based on substantial evidence.

Wolven also contends that the ALJ erred by not providing greater weight to the

opinion of her treating psychologist Dr. Davis.  Specifically, the ALJ determined that

> the opinions of Dr. Davis are unpersuasive in this case
> because they are not supported by clinical signs in her
> treatment notes and are inconsistent with [Wolven's]
> cooperative presentation in various environments throughout
> the disability process.  The undersigned gives significant
> weight to the opinions of Dr. Dubro because he conducted a
> thorough examination of [Wolven] and his opinions are
> consistent with the mental status findings from his
> examination and adequately take into account [Wolven's]
> subjective complaints.  Less weight is given to Dr. Ferrin's
> opinion because he did not examine the claimant.

T. 41.

Wolven received mental health treatment from November 2003 through May

2006 to assist her transition back into society after being incarcerated for ten years.  T.

200-215.  In 2004, her clinical assessment showed that despite her mild depressive

symptoms (T. 201), Wolven (1) had a neat and appropriate appearance; (2) was open,

articulate, cooperative, warm and friendly; (3) demonstrated a normal mood; (4) showed that her thought process was organized and her recent and remote memory were good; (5) exhibited concentration, judgment, and insight skills which were all good; and (6) demonstrated high motivation and a high average intelligence.  T. 210.  In 2005, Wolven's treatment notes indicate that while she struggled with remorse, she was adjusting well to non-prison life, was without any "acute mood or anxiety syndrome," and appeared "bright, insightful[,] reflective, [possessing] good judgment [and] impulse control [and] shows extensive remorse."  T. 212. Dr. Kalus noted that Wolven had "[n]o acute psychiatric issues," and recommended the continuation of psychotherapy.  Id.  In 2006, treatment notes indicate that Wolven had successfully met her treatment goals and that no further care was indicated.  T. 213.  In fact, the clinical risk manager, a licensed social worker, commented that Wolven "made considerable progress in treatment having obtained employment and . . . pursuing her education at the time of discharge."  T. 215; see also T. 214 (same).

The next time that Wolven sought any sort of mental health treatment was August 5, 2010, over eight months after her alleged onset date.  T. 284-298.  Wolven reported that she had suffered from a depressed mood daily for the past two weeks.  T. 284.  However, "[o]n a scale of 1-10, 10 being the most depressed, [Wolven] rated her depression at a 1 or 2 but [clarified that] it can get to a 10."  T. 290.  Wolven was noted to be anxious and depressed, but her intellectual functioning was average, her thought content appropriate, logical and coherent, and her attitude cooperative.  T. 291.  Additionally, her attention and concentration were fair, though her judgment and insight were limited.  T. 292.  Wolven commented that she was "determined" and "would like a

16

career but [her] criminal history limits [her]." T. 296.

Wolven then commenced treatment with Dr. Davis. T. 304. She first saw Dr. Davis on January 17, 2011. T. 304-05. At that time Dr. Davis noted that Wolven thought she was bipolar and had migraines, was a student who was close to completing her Bachelor's degree, and was recommended to increase her coping skills and become more independent. T. 305. However, no clinical signs of mental status examination defects were noted. On March 3, 2011, Dr. Davis completed a RFC questionnaire noting that Wolven had (1) slight impairments understanding and remembering short and simple instructions; (2) moderate impairments being able to carry out short and simple instructions; and (3) marked impairments being able to understand, remember or carry out detailed instructions or make work related decisions. T. 301. Wolven was also noted to have marked limitations interacting appropriately with the public, supervisors, and coworkers, or responding to work place pressures and changes in routine. T. 302. In her treatment notes, Dr. Davis indicates that Wolven had a normal appearance; depressed, anxious and emotionally fragile mood; a linear thought process; impaired judgment; and intact memory, both short and long term. T. 306. She indicated that Wolven had been in a stable relationship with her partner for two years. Id.

While filling out her disability application, Wolven indicated that she went out of the house alone and could drive herself places. T. 154. She also indicated that she talked on the phone and texted with people multiple times per week. T. 156. Wolven also indicated that she had no problems getting along with her family, friends or neighbors, unless they were in a crowd as that environment triggered migraines. Id.

On May 5, 2010, psychologist Dr. Ferrin completed an assessment for Wolven's case as well. T. 235-52. Dr. Ferrin concluded that Wolven was not significantly limited in her ability to (1) understand and remember short, simple, and detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods of time; (4) independently sustain an ordinary routine; (5) work in coordination with others without being distracted; (6) make simple work-related decisions; (7) interact socially with the general public and supervisors, respond to criticism and ask questions; (8) respond appropriately to changes in the work setting; and (9) set realistic goals. T. 249-50. Dr. Ferrin opined that Wolven had moderate limitations in her ability to (1) perform activities within a schedule, regularly maintain attendance and be punctual; and (2) complete a normal workday and week without an interruption from her psychologically based symptoms. Id.

Wolven contends that Dr. Davis was a treating source and thus, based on her treatment records and specialty training, her opinion should have been given controlling weight. Again, there is no question that Wolven was diagnosed with anxiety and that it was a severe impairment. This was agreed upon by all medical practitioners and recognized by the ALJ in his conclusions. T. 35. As before, the question is not whether the impairment existed and was severe, it is whether it was disabling. As was previously discussed, controlling weight is to be given only to those opinions which are well supported. 20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134. If the opinion is contradicted by the medical evidence, then it should be given less weight. 20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134. Also, as previously discussed, Dr. Dubro is an acceptable medical source whose opinion may also be entitled to

controlling weight.  See Fiozzo v. Barnhart, No. 05-CV-561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y. Jan. 19, 2011) (citations omitted); see also Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995)

In this case, substantial evidence supports the ALJ's decision to accord less weight to Dr. Davis in relation to Dr. Dubro.  Dr. Dubro's limitations were far less severe than Dr. Davis.  This is supported by the long history of cooperative interactions Wolven has had with multiple providers, her stable two-year relationship, and her testimony that she can independently complete her activities of daily living and that she talks and gets along with family and friends.

Dr. Dubro examined Wolven, but because this was only on one occasion, Wolven contends that it was insufficient to encompass a true picture of her mental health limitations.  Pl. Mem. of Law at 19 (citing Hilsdorf v. Commissioner of Soc. Sec., 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010)).  However, for the reasons stated above, Dr. Dubro's consultative examination is supported by the rest of the medical evidence. Furthermore, Dr. Davis only treated Wolven on two occasions, which does not constitute a prolonged treatment relationship.  Moreover, Dr. Davis' notes do not include any clinical signs of mental status examination defects from the first visit and represent inconsistent findings during the second.  While Dr. Davis finds moderate and marked limitations with the ability to remember various instructions, she noted that Wolven's memory, both short and long term, were intact.  The latter findings are consistent with the record as a whole, yet contrary to Dr. Davis' ultimate conclusions. Thus, the ALJ properly accorded less weight to Dr. Davis.

Wolven also contends that the ALJ was incorrect in according any weight to Dr.

Ferrin's opinion as he did not examine Wolven.  With respect to Wolven's concentration, persistence and pace, the ALJ deemed that Dr. Ferrin's opinion was given greater weight because it was consistent with the medical evidence, as was Dr. Dubro's, but more favorable to Wolven.  T. 37.  The ALJ gave no weight to Dr. Davis' opinion because, as discussed above, it was inconsistent with the medical evidence and her objective findings.  Id.  However, with respect to mental functioning, the ALJ gave less weight to Dr. Ferrin's opinion than Dr. Dubro because Dr. Ferrin did not examine Wolven.  T. 40-41.  This reasoning comports with the remedial nature of the Social Security statute.  Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990).  The ALJ was making a reasoned conclusion regarding Wolven's true capacities based on the medical record to ensure that her rights were adequately protected while also undertaking his duty to ensure that a decision on benefits was supported by substantial evidence.  There is no lack of clarity or inconsistency with the ALJ's intent.  In reading the opinion as a whole, it is clear how the ALJ is balancing the opinions of the various practitioners in arriving at a RFC which is supported by substantial evidence.

For the reasons stated above, the ALJ's decision to accord Wolven's treating physicians less weight was supported by substantial evidence as their conclusions were inconsistent with the medical record.  Accordingly, the ALJ's decision should be affirmed.

### 2. ALJ Misconduct

Wolven contends that her case requires remand due to misconduct on the part of the ALJ.  Specifically, Wolven contends that the ALJ asked inappropriate questions

regarding her sexual orientation and relationship which made her highly uncomfortable. Pl. Mem. of Law (Dkt. No. 10) at 23-25.  Wolven relies on Hartnett v. Apfel, 21 F. Supp. 2d 217 (E.D.N.Y. 1998) to support this proposition.

The Court held in Hartnett that remand to another ALJ was appropriate where the ALJ (1) improperly credited the claimant's decision not to undergo surgery as a reason to undermine his credibility; (2) on several occasions "mischaracterized or misunderstood the evidence before him;" and (3) "fail[ed] to consider the record with adequate care . . . ."  21 F. Supp. 2d at 222-23.  Here, Wolven's claims that the ALJ acted similarly insensitively and approached the ultimate holding of the case with mischaracterizations is disingenuous.  The ALJ did ask Wolven who she lived with after Wolven testified that she was forced to move from New York to Florida due to the decisions of "the person [she is] living with . . . ."  T. 52.  The ALJ asked additional follow-up questions about the nature of the relationship and whether Wolven's partner was working and where they derived their income from.  T. 53-54.  Such questions were relevant to understanding Wolven's station in life.

Moreover, the ALJ did not base his decision about Wolven's disability status or credibility on her sexual orientation or relationship with her partner, but instead focused on the lack of medical evidence.  When discussing Wolven's relationship in the decision, the only reference that the ALJ made was a statement that Wolven "admitted having a good relationship with her partner . . . ."  T. 36.  This is not a mischaracterization of Wolven's testimony at all, as Wolven indicated that if she could marry her partner, she would.  T. 53.  Furthermore, this statement does not intimate a discriminatory intent nor demonstrate any malice or ill will towards Wolven's decisions

on how to conduct her personal life.

Most telling is that fact that Wolven's own counsel believes that this argument is meritless.  This was indicated in Wolven's counsel's June 21, 2011 letter to the Appeals Council, where he states that the ALJ's questioning made Wolven uncomfortable but also admitted that "upon [their] audit of the hearing recording and review of [Wolven's] representative's hearing notes, [they] did not find the ALJ biased again [Wolven] . . . ." T. 13.

Accordingly, there is no reason to find that the ALJ was biased or that, if remand was granted, another ALJ ought to conduct the proceedings.  Therefore, it is recommended that Commissioner's decision be affirmed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Wolven's motion for judgment on the pleadings (Dkt. Nos. 9 & 10) be **DENIED** and the Commissioner's decision finding disability be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Date: November 12, 2013
     Albany, New York

Christian F. Hummel
U.S. Magistrate Judge